**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:21-cv-00305-MR-WCM**

TAQI EYR HHAMUL HESED EL,    )
a/k/a BRO T. HESED-EL,    )
                                        )
                    Plaintiff,    )
                                        )
        vs.    )    **<u>MEMORANDUM OF
                        DECISION AND ORDER</u>**
                                        )
ROBIN BRYSON and    )
MISSION HOSPITAL, INC.    )
                                        )
                    Defendants.    )
_____    )

**THIS MATTER** is before the Court on the Defendants' Motion for

Summary Judgment [Doc. 165], the Plaintiff's Motion for Partial Summary

Judgment [Doc. 170], and the Plaintiff's Motion for Payment of Reasonable

Expert Witness Fees [Doc. 224].

## I.    PROCEDURAL BACKGROUND

Taqi Eyr Hhamul Hesed El (the "Plaintiff") commenced the present

action—his third based on these facts[1]—by filing his Complaint on October

18, 2021, which he amended on February 22, 2022.  [Docs. 1, 14].  The

_____

[1] The Plaintiff has previously filed two civil actions alleging various claims stemming from
what he contends was his involuntary commitment at Mission Hospital during September
and October of 2016.  [See Doc. 138].  Both actions were dismissed.  [Id. at 2].

Plaintiff's claims stem from what he contends was his involuntary commitment at Mission Hospital during September and October of 2016. [Doc. 14]. The Plaintiff originally filed suit against additional defendants, but after such defendants filed Motions to Dismiss [Docs. 33, 60, 74], the Court ordered the case to proceed with respect to only the following claims: (1) "Gross Negligence/Willful and Wanton Conduct" against Defendant Robin Bryson; (2) negligent infliction of emotional distress against Defendant Robin Bryson; (3) "Negligent Supervision and/or Training" against Defendant Mission Hospital; and (4) "Respondeat Superior" against Defendant Mission Hospital. [Doc. 87].

On April 3, 2024, the Defendants Robin Bryson ("Bryson") and Mission Hospital, Inc. ("Mission") moved for summary judgment on all remaining claims. [Doc. 165]. On the same day, the Plaintiff filed a Motion for Partial[2] Summary Judgment. [Doc. 170]. On April 17, 2024, the Defendants filed a Response in Opposition to the Plaintiff's Motion. [Doc. 185]. On May 14, 2024,[3] the Plaintiff filed a Reply in support of his Motion for Partial Summary

---

[2] It is unclear why the Plaintiff considers his Motion to be partial as it states that he is moving for judgment on "Plaintiff's claims against Robin Bryson and Mission Hospital, Inc.," but does not further specify which claims. [Doc. 170]. Therefore, the Court will construe the Plaintiff's Motion as a Motion for Summary Judgment on all his remaining claims.

[3] The Court notes that the Plaintiff's extended deadline to file these documents was May 13, 2024, but they were delivered to the courthouse on that day after the Clerk's Office

Judgment, as well as a Response in Opposition to the Defendants' Motion for Summary Judgment. [Docs. 202, 203]. On May 21, 2024, the Defendants filed a Reply in support of their Motion for Summary Judgment. [Doc. 211].

On May 28, 2024, the Plaintiff filed a Motion for Payment of Reasonable Expert Witness Fees for his expert witness, Dr. Ryan Kaufman. [Doc. 224]. On June 11, 2024, the Defendants filed a Response in Opposition to the Plaintiff's Motion. [Doc. 232]. On June 18, 2024, the Plaintiff filed a Reply to the Defendants' Response. [Doc. 236].

Having been fully briefed, these matters are now ripe for disposition.

## II.   STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "As the Supreme Court has observed, 'this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine*

_____

had closed. Therefore, these filings were technically filed past the deadline, but the Court will nonetheless accept and consider them.

issue of *material* fact.'" <u>Bouchat v. Baltimore Ravens Football Club, Inc.</u>, 346 F.3d 514, 519 (4th Cir. 2003) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986)) (emphasis in original).

A genuine issue of fact exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party. <u>Shaw v. Stroud</u>, 13 F.3d 791, 798 (4th Cir. 1994), <u>cert. denied</u>, 513 U.S. 814 (1994). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." <u>Bouchat</u>, 346 F.3d at 522. If this showing is made, the burden shifts to the nonmoving party who must convince the Court that a triable issue exists. <u>Id.</u> In considering the facts on a motion for summary judgment, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party. <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986).

## III.    FACTUAL BACKGROUND

Viewing the forecast of evidence in the light most favorable to the Plaintiff, the following is a recitation of the relevant facts.

On September 20, 2016, law enforcement officers brought the Plaintiff to Mission and told medical personnel that he was found naked on the

4

grounds of the Biltmore Estate "running around, talking about Jesus." [Doc. 166: Medical Records at 2, 5]. Upon arrival to the hospital, the Plaintiff had "an outburst and acted violent," leading medical providers to administer Lorazepam and Haloperidol to subdue and sedate him. [Id. at 10].

Medical records from Mission show that on initial examination, the Plaintiff, when asked what his name was, said "I don't have a name. I was kidnapped by the police and brougt [*sic*] to this place." [Id. at 2]. The Plaintiff refused to give his name or any identifying information, and asked for pen and paper so he could write a contract and sue the hospital staff. [Id.]. He claimed he was being poisoned by hospital staff and refused lab work, saying, "It is theft if you take my blood. . . . You will answer to Jesus Christ." [Id. at 2-3]. Medical records also indicate that the Plaintiff's sister contacted the hospital sometime after he arrived. [Id. at 2]. She was not aware of the Plaintiff having any psychiatric history, history of psychosis, or history of substance misuse, and said of the Plaintiff's behavior: "[T]his is new. I have never heard him talk like this before." [Id.]. The Plaintiff's sister also said that she had not seen the Plaintiff in sometime and was unsure where he was living. [Id.].

Defendant Robin Bryson ("Bryson") performed the Plaintiff's initial behavioral health examination. [Id.]. Bryson has been a licensed clinical

5

social worker since October 10, 2013, and has worked at Mission Hospital since 2014. [Doc. 168-3 at ¶¶ 3-4]. She has been certified by the North Carolina Department of Health and Human Services ("DHHS") to conduct involuntary commitment evaluations since April 29, 2016.[4] [Id. at ¶ 5; Doc. 187-1: Bryson Aff. at ¶¶ 4-6]. Bryson was therefore properly licensed as a social worker and certified to conduct involuntary commitment evaluations at the time of the events at issue in this case. [Id. at ¶¶ 4, 7].

Based on her initial examination of the Plaintiff, Bryson recommended that the Plaintiff be seen for a full psychiatric evaluation due to his mental status and the lack of known history of his symptoms, and that if the Plaintiff tried to leave, he would meet the criteria for involuntary commitment. [Id.].

---

[4] The Plaintiff disputes that Bryson was lawfully permitted to perform his first commitment examination because she performed the examination without the "required statutory waiver." [Doc. 204 at 12]. However, the statutory requirements for certification of commitment examiners are clear that

> [t]he Secretary of Health and Human Services may individually certify to perform the first commitment examinations required by [statute] other health, mental health, and substance abuse professionals whose scope of practice includes diagnosing and documenting psychiatric or substance use disorders and conducting mental status examinations to determine capacity to give informed consent to treatment . . .

N.C. Gen. Stat. Ann. § 122C-263.1(a). The Plaintiff himself provided documentation from DHHS showing that Bryson was a certified examiner. [Doc. 185-1; Doc. 175-6 at ¶¶ 15-16]. Bryson confirmed that she was certified as of April 29, 2016, in her affidavit. [Doc. 187-1 at ¶ 5-6]. Therefore, the Plaintiff has failed to raise a genuine issue of fact as to Bryson's certification.

She consulted with an Emergency Department Licensed Provider who agreed with her plan. [Id.]. Later that same day, Bryson filed an Affidavit and Petition for Involuntary Commitment with Buncombe County District Court. [Doc. 167 at 12]. In that filing, Bryson represented to the court: "Due to altered mental status, [the Plaintiff] is unable to reliably contract for safety at this time and at further risk of decompensation without psychiatric intervention to endure [*sic*] safety." [Id.]. A custody order was issued by a Magistrate that evening, and the Plaintiff was served with the order by a law enforcement officer with the Buncombe County Sherriff's Office at approximately 11:50 p.m.[5] [Id. at 16]. Medical records indicate that upon the Plaintiff being taken into custody, Bryson provided him with a notification of involuntary commitment and a fact sheet. [Doc. 166 at 18; Doc. 168-3: Bryson Aff. at ¶ 16].

The Plaintiff's medical records note his numerous comments and behaviors that led medical providers to be concerned for his safety and well-being prior to his discharge. On September 22, the Plaintiff's progress notes

---

[5] The Plaintiff "disputes the authenticity of the magistrate's temporary custody order, the signature thereon, and alleged service of the custody order," as well as "whether the magistrate was lawfully appointed or elected into office." [Doc. 204 at 3]. These arguments, however, appear to challenge the validity of the underlying state court order, which is a matter beyond the purview of this action. Therefore, absent any other indication that the provided records are illegitimate, this Court will consider these facts to be undisputed.

state: "While remains unclear as to the patient's immediate dangerousness clearly his psychotic delusions have already shown him to present a severe lack and [*sic*] judgment and puts him at a risk of accidental self-harm due to poor decision making."  [Doc. 166 at 16].  The same day, treatment records note:

> [The Plaintiff] indicated tha he no longer considers himself a citizen of the US, feels laws of the country/state do not apply to him; explains that he has created his own constitution, has sent this to the federal and several local governments. Stated that the FBI, Homeland Security, etc "all know who I am". He spoke as though he and his generation are operating on a much higher level than other people, eventually explained that he is a disciple of the "Moorish Science Church of America"; this reporter briefly researched this religion; pt's world view does seem to be greatly informed by this somewhat obscure religion. Pt feels society is on the verge of unravelling; feels the US and capitalism are about to crumble; indicated that he and others (unclear who he is talking about) are going to establish their own communal living situation. Pt speaking in highly intellectualized, esoteric terms about minutia of US history, political science, federal/state law. Very difficult to engage pt in grounded discussion about the very basic nature of his presence in the hospital. Pt very dismissive of psychiatry and medicine, feels he and other just operate at a "higher frequency", seems to pity those who don't see things in these terms.

[Doc. 167 at 5] (errors uncorrected).

On September 26, treatment records note:

The patient remains paranoid and refusing all treatment. I asked him if he had any more thoughts about being naked on the Biltmore state the patient responded that he would take this up with "the Biltmore company." I explained that the estate is actually on by the Vanderbilt family and the patient began to ruminate on this and said "that is just hearsay." The patient then became highly focused on who the Vanderbilts were and whenever this writer had ever seen the "deed to the property." The patient then began asking this writer whether I was part of the Vanderbilt family and when I said I was not he said "then I am going to terminate this interview." The patient then began asking this writer questions including whether this writer had student loans and if so then "we the people have determined you to be too corrupted to make clinical decisions."

[Id. at 19] (errors uncorrected).

On October 3, upon examination, a medical provider's notes state the following:

Patient maintains he is a "free agent" of the "United States Corporation of America" and "I do not have to pay for anything, I am an ambassador of love." Patient then hands [the provider] a cut out heart he made form blue construction paper "I just give out hearts and love all day." Patient goes on to say he did "not refuse medications, my reality will not be filled in by professional liars, I said I wanted a periodic table so that I knew what it is I am ingesting." . . .

Patient reports that the night before he was caught walking on Biltmore Estate naked he did not sleep. Patient reports he usually sleeps well, so this was unusual. He also received a "claims form" for a "sweepstakes", and on the form it said you can claim

whatever you want to I claimed when my car got hit by someone in Savannah and I claimed 250, 000 on the ticket. I mean it said anything." The patient then stares at PC quizzically.

Patient reports when he could not sleep he began "thinking of the purge [movie] and how the government uses sound weapons and I was hearing this buzzing noise, so I started to run a bath and I stayed there all night, just letting the water out and then filling up again. When the sun rose I stretched and went to get my tickets. They gave me an ambassador ticket and I filled out my claims form, remember? So I gave it to her for the 250, 000 and she said I've never seen anything like this and she went to get her supervisor. SO I left, and went right past the gates and they let me, and this just made me feel like I was one with the world and the universe and the light form the trees, and the air, and I just started taking off my clothes and my shirt next thing you know there are two white trucks and one of them is trying to give me a blanket."

[Id. at 3-4] (errors uncorrected).

The Plaintiff remained under involuntary commitment and was treated at Mission until he was discharged on October 5, 2016. [Doc. 167: Medical Records at 63]. Over the course of his commitment, the medical records note that the Plaintiff's condition was slowly improving in that he "was better able to have a linear conversation," despite his continuing to be "expansive and grandiose." [Id. at 62-63]. On October 4, 2016, the records note that although the Plaintiff "[could] certainly benefit from ongoing treatment with

antipsychotic medication," he "ha[d] not demonstrated any indication of being a direct danger to himself or others due to his mental illness." [Id. at 57-58].

At this point, Mission was also in communication with the Plaintiff's family to coordinate his safe discharge. [Id. at 63]. Notes in medical records from the day of the Plaintiff's discharge from Mission state: "The patient's poor judgment and insight does put him at a chronic risk for poor decision making that may cause him harm. However, there is no current evidence of imminent dangerousness so will drop the involuntary commitment and discharge the patient to his family as per his wishes and theirs." [Id. at 62]. On October 5, 2016, the Plaintiff's brother travelled to North Carolina from Georgia to take the Plaintiff home with him, and the Plaintiff was discharged from Mission. [Id. at 63]

## IV. DISCUSSION

### A. Statute of Limitations

A claim for medical malpractice in North Carolina is barred by the statute of limitations unless brought within three years of the date the claim accrues. N.C. Gen. Stat. § 1-15(c). "Except where otherwise provided by statute, a cause of action for malpractice arising out of the performance of or failure to perform professional services shall be deemed to accrue at the time of the occurrence of the last act of the defendant giving rise to the cause of

action."  Id.  "Where the aggrieved party is under disability at the time the cause of action accrues, the action must be commenced 'within three years next after the removal of the disability, and at no time thereafter.'"  Shearin v. Lloyd, 246 N.C. 363, 367, 98 S.E.2d 508, 511 (1957) (quoting N.C. Gen. Stat. § 1-17(a)).  The statutory definition of "under disability" includes persons who are "incompetent."  N.C. Gen. Stat. § 1-17(a).  N.C. Gen. Stat. § 35A–1101(7) defines an incompetent adult as

> an adult or emancipated minor who lacks sufficient capacity to manage the adult's own affairs or to make or communicate important decisions concerning the adult's person, family, or property whether the lack of capacity is due to mental illness, mental retardation, epilepsy, cerebral palsy, autism, inebriety, senility, disease, injury, or similar cause or condition.

N.C. Gen. Stat. § 35A–1101(7).

The Plaintiff originally filed suit on October 7, 2019, before voluntarily dismissing that case on October 22, 2020, and filing the present action on October 18, 2021.  [Doc. 168 at 10; Doc. 171 at 1].  North Carolina courts sitting in diversity apply North Carolina Rule of Civil Procedure 41(b) to determine the effect of a voluntary dismissal of state law claims.  Topshelf Mgmt., Inc. v. Campbell-Ewald Co., 203 F. Supp. 3d 608, 611 (M.D.N.C. 2016) (citing Haislip v. Riggs, 534 F.Supp. 95, 98 (W.D.N.C.1981) ("The tolling of a state statute of limitations in a diversity case is strictly a

substantive matter of state law which [Supreme Court precedent] command[s] that this Court follow absent substantial countervailing federal interests.")). The savings provision of Rule 41 of the North Carolina Rules of Civil Procedure provides that where a party voluntarily dismisses an action, "a new action based on the same claim may be commenced within one year after such dismissal" and will still be considered timely. N.C. Gen. Stat. 1A-1, 41(a)(1).

Having determined that the savings provision of Rule 41 applies, the next issue is establishing the date of accrual of the Plaintiff's claims. The Defendants argue that the relevant date of accrual of the events at issue is September 20, 2016, the date the Plaintiff was committed, and therefore, the Plaintiff had until September 20, 2019, to file his Complaint. [Doc. 168 at 10]. The Plaintiff, in reliance on N.C. Gen. Stat. § 35A-1101(7), argues that the appropriate date of accrual is instead October 5, 2016, the day he was discharged, because he was under a disability during the entirety of his commitment at Mission. [Doc. 204 at 8-9]. Therefore, the Plaintiff argues, the statute of limitations expired on October 7, 2019. [See id. at 8].

The parties have forecast evidence from which a reasonable jury could find that the Plaintiff was under a disability and lacked capacity to manage his own affairs throughout the time he was committed at Mission and until he

13

was discharged on October 5, 2016. Therefore, taking the forecast of evidence in the light most favorable to the Plaintiff, the statute of limitations did not expire until October 7, 2019,[6] and this action was timely filed. Summary judgment on this basis is thus improper and will be denied.

## B.    Claims Against Defendant Robin Bryson

### 1.    Gross Negligence/Willful and Wanton Conduct

Under North Carolina law, "[g]ross negligence has been defined as 'wanton conduct done with conscious or reckless disregard for the rights and safety of others.'" Toomer v. Garrett, 155 N.C. App. 462, 482, 574 S.E.2d 76, 92 (2002) (quoting Bullins v. Schmidt, 322 N.C. 580, 583, 369 S.E.2d 601, 603 (1988)). "Aside from allegations of wanton conduct, a claim for gross negligence requires that plaintiff plead facts on each of the elements of negligence, including duty, causation, proximate cause, and damages." Id.

The Plaintiff claims Defendant Bryson was grossly negligent in petitioning for his involuntary commitment ("IVC") in violation of N.C. Gen. Stat. § 122C-263 in that she should have known that the Plaintiff did not meet

---

[6] The Court takes judicial notice of the fact that October 5, 2019, was a Saturday, and therefore the Plaintiff had until the following Monday, October 7, 2019, to file his action. Winston v. Livingstone College, Inc., 210 N.C. App. 486, 486, 707 S.E.2d 768, 769 (2011) (citing N.C. Gen. State § 1-593 and N.C.R. Civ P. 6(a)).

the criteria for IVC.  The relevant IVC statute provides that a commitment

examination

> shall include an assessment of at least all of the
> following with respect to the respondent:
> (1)  Current and previous mental illness and
>       intellectual disability including, if available,
>       previous treatment history.
> (2)  Dangerousness to self . . . .
> (3)  Ability to survive safely without inpatient
>       commitment, including the availability of
>       supervision from family, friends, or others.
> (4)  Capacity to make an informed decision
>       concerning treatment.

Id. § 122C-263(c).

The Plaintiff has presented no forecast of evidence that Bryson

engaged in any conduct that was in reckless disregard to his rights or safety

in petitioning for IVC.  By contrast, Bryson has presented a forecast of

evidence that she complied with the statutory requirements for seeking an

IVC and assessed the situation appropriately using her expertise and

experience.  [See Doc. 168-3 at ¶ 10; Doc. 187-1 at ¶ 9].  For one, the

Plaintiff presented with symptoms of mental illness after initially arriving at

the hospital nonverbal.  [Doc. 165 at 6].  These symptoms as documented

by Bryson and other responding medical providers included disorganized

thought process, incongruent affect, rapid speech, volatility, irritability,

mumbling, and violent outbursts.  [Id. at 2, 6, 10].  The only other information

15

about the Plaintiff's history of mental illness came from his sister, who was not aware of any mental illness or substance abuse in the past, leaving Bryson without any context as to the Plaintiff's behavior or presentation of symptoms.

Based on her observations of the statements and behavior[7] of the Plaintiff at the time of the IVC referral, Bryson determined that the Plaintiff was dangerous to himself due to his impaired judgment and delusional thinking. [See Doc. 167 at 12]. With the limited information available to her, Bryson also concluded that the Plaintiff would not be safe if he left the hospital and was not in a position to make informed decisions about his own treatment. [See id.] These findings were properly documented in the affidavit and petition that Bryson filed with the court and are further supported by the Plaintiff's medical records. [Doc. 166 at 14]. Furthermore, Bryson sought a second opinion from an attending physician, who agreed with her assessment. The forecast of evidence presented therefore shows that Bryson acted within the standard of care in complying with the IVC statute.

The Plaintiff also claims a violation of section (g) of the IVC statute, which states: "The commitment examiner, at the completion of the

---

[7] Critically, the Plaintiff does not dispute the facts of his own statements and behavior that ultimately led Bryson to recommend and petition for his commitment.

examination, shall provide the respondent with specific information regarding the next steps that will occur." N.C. Gen. Stat. § 122C-263(g). With regard to Plaintiff's claim that Bryson did not provide him with information about next steps after his commitment, the medical records indicate that she gave the Plaintiff an IVC fact sheet after he was taken into custody. [Doc. 166 at 18].

This series of actions by Bryson, as documented in the provided medical records and further supported by her affidavits,[8] do not suggest any breach of the standard of care or of the relevant state law governing IVC commitments, much less any action that was in reckless disregard to the Plaintiff's rights or safety. Due of the complete lack of evidence supporting this claim, summary judgment will be granted to the Defendants, and this claim will be dismissed with prejudice.

## 2. Negligent Infliction of Emotional Distress

"To state a claim for negligent infliction of emotional distress, the plaintiff must allege that: '(1) the defendant negligently engaged in conduct,

---

[8] The Plaintiff argues that Bryson's affidavits should be disregarded as "self-serving" "attempts to 'clean up' her medical negligence" because they include information that was not included in the medical records at the time of the events at issue. [Doc. 204]. While Defendant Bryson admits that she does not have specific memories of the events at issue, she explains that, in preparing her affidavits, she relied on the documentation she made in the Plaintiff's medical records as well as her usual and habitual professional practices. [Doc. 168-3 at ¶ 6-7]. Given that Bryson's sworn statements are consistent with the medical records and based on her professional experience, the Court finds that the Plaintiff's arguments as to their reliability are without merit.

(2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress, and (3) the conduct did in fact cause the plaintiff severe emotional distress.'"  Riddle v. Buncombe Cnty. Bd. of Educ., 256 N.C. App. 72, 74, 805 S.E.2d 757, 760 (2017) (quoting Sorrells v. M.Y.B. Hosp. Ventures of Asheville, 334 N.C. 669, 672, 435 S.E.2d 320, 321-22 (1993)).

North Carolina state law immunizes hospitals and their employees from civil liability for their actions which are not grossly negligent.  N.C. Gen. Stat. § 122C-210.1.  Even if the Plaintiff had adequately forecasted evidence that Bryson engaged in negligent conduct, which he has failed to do, this claim would be barred by this statutory immunity.  As previously discussed, the Plaintiff has not forecasted evidence of any facts that even border on gross negligence on the part of Defendant Bryson.

Therefore, the Plaintiff's claim for negligent infliction of emotional distress will be dismissed.

**C.    Claims Against Defendant Mission Hospital**

**1.    Negligent Supervision/Training**

"To support a claim of negligent retention and supervision against an employer, the plaintiff must prove that the incompetent employee committed a tortious act resulting in injury to plaintiff and that prior to the act, the

employer knew or had reason to know of the employee's incompetency." Smith v. Privette, 128 N.C. App. 490, 494-95, 495 S.E.2d 395, 398 (1998) (citation and internal quotations omitted).

The Plaintiff has not presented any forecast of evidence that Mission knew or had reason to know that Bryson was incompetent, nor has he successfully presented a forecast of evidence from which a reasonable jury could conclude that Bryson committed a tortious act to which Mission's liability could attach. Therefore, summary judgment will be granted to Mission on this claim.

## 2. Respondeat Superior

"The doctrine of respondeat superior generally allows an employer (sometimes referred to as a 'principal' in this context) to be held vicariously liable for tortious acts committed by an employee (sometimes referred to as an 'agent' in this context) acting within the scope of his employment." Creel v. N.C. Dep't of Health & Human Servs., 152 N.C. App. 200, 203, 566 S.E.2d 832, 834 (2002).

Because the Plaintiff has not successfully forecast any evidence of a tortious act by Bryson, the only hospital employee remaining as a Defendant in this matter, there is no underlying act for which Mission can be vicariously

liable. Therefore, the Defendants' Motion for Summary Judgment will be granted with respect to this claim.

### D. Expert Witness Fees

Federal Rule of Civil Procedure 26 requires courts to order the party seeking an expert witness's deposition to "pay the expert a reasonable fee for time spent in responding" to the deposition request, "unless manifest injustice would result." Fed. R. Civ. P. 26(b)(4)(E).

Here, the Plaintiff seeks an order directing the Defendants to pay for the time the Plaintiff's expert, Dr. Kaufman, charged for his deposition. [Doc. 224 at 1]. However, from the invoice provided by the Plaintiff, it appears that the Defendants have already compensated Dr. Kaufman for his time spent responding to their discovery requests, as Rule 26 requires, and the only outstanding fee due to Dr. Kaufman is for the time the Plaintiff spent conducting his own discovery with his own witness. These costs are not within the scope of Rule 26, and therefore, this Motion will be denied.

## V. CONCLUSION

The Plaintiff has failed to carry his burden in showing a triable issue exists in order to defeat the Defendants' Motion for Summary Judgment. Therefore, all of the Plaintiff's claims against the Defendants will be

dismissed, the Defendants' Motion for Summary Judgment will be granted, and the Plaintiff's Motion for Partial Summary Judgment will be denied.

## ORDER

**IT IS THEREFORE ORDERED** that:

(1) The Defendants' Motion for Summary Judgment [Doc. 165] is **GRANTED**,

(2) The Plaintiff's Motion for Partial Summary Judgment [Doc. 170] is **DENIED**;

(3) The Plaintiff's Motion for Payment of Reasonable Expert Witness Fees [Doc. 224] is **DENIED**; and

(4) The Plaintiff's claims are hereby **DISMISSED WITH PREJUDICE**.

The Clerk of Court is respectfully directed to close this civil case.

**IT IS SO ORDERED.**

Signed: June 27, 2024

Martin Reidinger
Chief United States District Judge